# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| GABRIEL SORIANO, | ) | 1:08cv0924 GSA |
| | ) | |
| | ) | |
| | ) | ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) | SOCIAL SECURITY COMPLAINT |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **BACKGROUND**

Plaintiff Gabriel Soriano ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On August 5, 2008, the action was reassigned to the Honorable Gary S. Austin for all purposes.

1

# **FACTS AND PRIOR PROCEEDINGS**[2]

On or about November 3, 2005, Plaintiff filed an application alleging disability since June 30, 1987, due to back problems. AR 73-75.[3] His application was denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 8-8a, 44. ALJ Patricia Leary Flierl held a hearing on September 28, 2007, and issued an order denying benefits on November 20, 2007. AR 12-21, 190-226. On April 18, 2008, the Appeals Council denied review. AR 6-7a.

Hearing Testimony

ALJ Flierl held a hearing in Fresno, California, on September 28, 2007. Plaintiff appeared, testified, and was represented by Melissa Proudian. Vocational Expert Cheryl R. Chandler also testified at the hearing. AR 190.

Plaintiff testified that he was twenty years old. AR 193. He lives with his mom and four siblings in Fresno. AR 194. He does not have a driver's license, and only recently began to learn how to drive. He believes he completed the ninth grade; he does not have a diploma or GED. AR 195-196. He has never worked because of "all the back problems." AR 196.

Plaintiff was born with spina bifida. He had surgery at two months of age, and again at the age of fifteen years. AR 197. Prior to the latter surgery, he was in pain but believes the pain worsened after surgery. AR 197. The pain is primarily in his lower to mid back area, and he feels it in his stomach as well. AR 198. He feels pain every day and assigned it a 6 on the scale of 1 to 10. AR 198-199. He currently treats the pain with regular Tylenol; he does not take any prescription medications. AR 199, 220.

The pain he feels every day can be aggravated when he tries to clean his room, as an example. He testified that he "can't do nothing [*sic*] because it will hurt." AR 200. When cleaning his room, if he tries to pick something up, the pain will increase. AR 200.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[3] The application completed by Plaintiff's mother indicates a date of June 30, 1987, as the date disability began. AR 73. For reasons that are unclear, yet not relevant to this Court's decision, the ALJ used November 30, 2005, as the date disability began. *See* AR 12, ¶ 1.

He cannot sit or stand for long periods of time without needing a break or change of position. AR 200-201. He believes he could walk for about ten minutes before he would need to stop and sit, and his left leg may give out as well. AR 201. He could lift ten pounds. AR 201.

Plaintiff complained that when reaching out at shoulder height his arms "fall asleep a lot" and he thinks the "nerves are messed, like I can't like really - - it gets like stuck, you know." AR 202. He also complained that his left hand cramps up. AR 203.

He admitted that it had been some time since he had seen his treating physician, or Dr. Woodward who treats his back. AR 203-204. Dr. Woodward told him he would have problems with his back for the rest of his life, and that he may require another surgery in the future. AR 203-204.

When asked about a notation in his medical records that he fails to follow through with treatment, Plaintiff responded that the doctors were "just giving me the runaround. Like there's no sense in the things that they're saying. Like I told them like I can't walk, I can't - - they're telling me like, well, walk a mile every day." AR 204-205. Additionally, Plaintiff testified that they ask him about his sexuality and that makes him uncomfortable. AR 205.

Following surgery in 2002, Plaintiff experienced pain in his mid-section. The pain was so great that he cried on occasion. He experiences pain while using the restroom, and this will occur once a week and affect him for the entire day. He will often require the use of the restroom eight or nine times a day, for seven or eight minutes at a time. AR 206-207. He feels like he has to urinate urgently and has little control. He has had accidents in the past, but does not wear protection against accidents because he tries to be as normal as possible. AR 207. He advised Dr. Woodward of this condition, but Dr. Woodward told him she had nothing to do with that, and instead referred him to another doctor. AR 207-208. He did not follow through with that doctor because "they were talking about like my kidneys maybe failing and my liver and . . . I kind of got scared." AR 207-208. The doctor wanted to run some tests, but Plaintiff was afraid to follow through. AR 208, 220.

Plaintiff also complained that his left leg is weaker than his right leg, and that the weaker leg is "real skinny and the other one is like big." AR 208. The left leg will give out "maybe like

3

three times a day." He fell yesterday at his grandmother's home as a result. He has suffered bruising in the past, but does not use a cane. AR 208-209. He also complains that his feet are deformed because his right foot is different than his left foot, his right leg is longer than his left, and he wears two different shoe sizes. AR 210-211. When he walks he has pain in his right leg. AR 211. When asked if he was to wear anything in his shoe on the left side, he replied that he wears slippers because it is easier to do so, versus buying two pairs of shoes to accommodate the different sizes he would need. AR 211-212.

Plaintiff expressed displeasure that his surgical scar was "crazy" whereas others who had undergone the same surgery had a "perfect scar." He believes his scar is a deformity. AR 210.

With regard to depression, Plaintiff indicated that depression affects him every other day. When asked how long the depression lasts, Plaintiff testified that at the PACT unit in 2005 he was told that he was having withdrawal symptoms and would be depressed for thirty minutes and would suddenly snap out of it. AR 212. He was in the PACT unit overnight in 2005 because he tried to commit suicide. AR 212-213. Upon his release, Plaintiff was to see a counselor or therapist, but he did not follow through. He is not currently being treated for depression. AR 213. When he is depressed, he does not want to do anything. He used to be a straight A student with plans. AR 213. Now he is frustrated because his brothers will graduate before him, yet he is older. AR 214. When asked if he had suicidal thoughts, Plaintiff said that he did, but that he knew he would not take any action on those thoughts because he was afraid to do so. AR 215.

Plaintiff testified that he left school because he could not sit in the chairs due to the back pain. He was placed on home study, but then Dr. Woodward indicated he could not do home study anymore and that he could not go back to school, so he "had to drop out." AR 214.

He does not enjoy being around a lot of people, and has always tended to isolate himself. He is self-conscious and does not like people staring at him. AR 214.

Plaintiff testified that he could concentrate on a task for a half hour to an hour before needing to take an hour long break. AR 215-216. During a typical day, Plaintiff will sleep for about "eleven hours." He goes to bed at 1:30 a.m. at the latest, and sleeps until 3 or 4 p.m. the following day. AR 216-217. He gets up and then watches television, lying down. He

occasionally helps with cooking or cleaning, but no one asks for his assistance much any more because it is a hassle. Were he to vacuum for ten minutes or so, he would be out of breath and would need to go lie down for about twenty minutes. AR 217-218.

When asked about the diagnosis of gender identity disorder,[4] Plaintiff testified that he knows who he is, and that others were the ones confused. He admitted feeling self-conscious about the gender identity issue, and does not like to discuss it. AR 218.

Plaintiff last used marijuana in August 2007. AR 218-219. He has not used methamphetamine since 2005. He recalled having to go to the hospital on more than one occasion as a result of the drug use; he guessed he had overdosed because his heart was racing. He quit on his own. AR 219.

Plaintiff testified that while he has friends, he does not go out and do things with them. Rather, his friends will come visit him at his house because he would not be comfortable in someone else's home should he have to lie down. AR 219-220.

When asked whether he considered Dr. Kaji his treating physician, Plaintiff replied that he did not know, but that he had met the doctor only once. However, Plaintiff did state that he was supposed to get braces for both legs to help him learn to walk better. AR 221. He still intends to get the braces even though it has been about a year since he saw Dr. Kaji. AR 220, 222. Plaintiff indicated that he has a doctor's appointment in October, after having missed several appointments, but he does not know which doctor he will see on that occasion. His mother takes care of that, and she would know whether or not he is covered by health insurance, because he does not know. AR 222.

Cheryl R. Chandler testified as a vocational expert. AR 223. Ms. Chandler was asked about four hypothetical situations. In the first, Ms. Chandler was asked to consider a person of the same age, education background and work history as the Plaintiff, with a limitation of light work with occasional climbing, kneeling and crouching, and no repetitive bending or stooping. Ms. Chandler opined that jobs for this individual existed in the category of unskilled, light work,

---

[4]The medical records include references to Plaintiff as a female, and notations that Plaintiff dressed as a woman, had long blond hair, wore nail polish and had a feminine affect. E.g., AR 110, 112, 127-129, 130, 150.

including retail sales positions, receptionists, and information clerks. In California, there were 23, 200 such jobs. AR 223.

In the second hypothetical, Ms. Chandler was asked to consider that the person was limited to sedentary work with occasional climbing, balancing, kneeling, crouching, crawling and stooping. Ms. Chandler indicated positions were available for such persons, including receptionists and information clerks, and general offices clerks. There were 21,700 such jobs available. AR 223.

In the third hypothetical, Ms. Chandler was asked to consider that the person was limited to sedentary work with occasional climbing, balancing, kneeling, crouching, crawling and stooping with a sit/stand option. Positions for such an individual exist, and include assembly and production workers, and hand packaging workers. In California, 4,600 jobs of this sort were available. AR 224.

Finally, Ms. Chandler was asked to consider that the person suffered from chronic pain, and due to that pain, the individual would need frequent breaks and opportunities to lie down during the day. For that individual, Ms. Chandler indicated there are no jobs. AR 224.

Medical Record

There are a number of records that specifically relate to Plaintiff's April 2, 2002, surgery at Children's Hospital Central California ("CHCC") that need not be reviewed and reiterated here with particularity. *See* AR 132-140, 143-144.

On April 18, 2002, a clinic note from CHCC indicates Plaintiff complained of having difficulty starting urination, but there was no leakage, fever or chills. It was noted that "back pain and sciatica" had improved. It was recommended his intake of apple juice and similar foods be increased to make bowel movements easier to start. He was to follow up in two weeks time. AR 141.

On January 6, 2003, Plaintiff was assessed by CHCC Physical Therapist Kimberlea Hamilton. Physical therapy was recommended to work on the scar tissue following surgery, and to improve strength in Plaintiff's lower extremities, trunk and back, through stabilization exercises. AR 145-147.

On March 25, 2003, Ms. Hamilton advised Edward Tang, M.D., that Plaintiff had been discharged from therapy due to three cancellations and two no-shows. A phone call from Plaintiff's mother on March 10 advised that she was going to see Dr. Tang to determine whether Plaintiff should continue with therapy, but she failed to return subsequent phone calls. AR 142.

On April 28, 2003, Plaintiff saw Dr. Meredith Woodward, his pediatric neurosurgeon, at CHCC. He complained of pain in the bone graft site and in the mid back. His range of motion was good. It was noted that Plaintiff missed a number of appointments in the Pain Management Clinic and with physical therapy. Dr. Woodward found it unnecessary to intervene from a neurosurgical standpoint, and recommended that Plaintiff continue to take Motrin for pain, and to follow up with the Pain Management Clinic; an appointment was scheduled for that purpose. AR 148-149.

On August 20, 2005, Plaintiff was treated at Community Hospital in the Mental Health Department following a suicide attempt. The Fresno Police Department was called because Plaintiff was armed with a knife and was threatening to hurt himself. He later indicated that he had smoked methamphetamine the night before. He was diagnosed with suicidal ideation and it was noted that Plaintiff was "stressed out" about gender identity, housing, education, and employment. Plaintiff was discharged the following day, and was advised to follow up for counseling. AR 159-189.

On November 18, 2005, Benjamin Chang, M.D., performed an orthopedic consultation of Plaintiff at the request of the Department of Social Services. Dr. Chang concluded that Plaintiff was unable to perform work that required repetitive bending and heavy lifting, but that he could lift twenty pounds occasionally and ten pounds frequently, and could stand and walk for six hours of an eight-hour workday. Plaintiff could sit for six hours, and could kneel, squat and climb stairs occasionally. AR 157-158.

On November 28, 2005, Plaintiff saw Dr. Woodward at CHCC and complained of daily pain between his shoulder blades and in the lumbar area. His left foot was weaker and has worsened over time. Plaintiff stated that he went to physical therapy once but that it only helped for a few days. The bladder urgency previously complained of had improved, but constipation

remained severe. He self-medicated with Tylenol. Plaintiff assigned the pain a 3 or 4 on a scale of 1 to 10. Dr. Woodward's impression refers to mild to moderate low back pain. She did not believe reoperation would assist Plaintiff, and continued to believe he would benefit from a pain management system and physical therapy. It was noted that Plaintiff "needs a total body conditioning program." A reference is made to Plaintiff's lack of participation in physical therapy or pain management. AR 150-152.

On December 30, 2005, medical consultant E.E. Wong completed a Physical Residual Functional Capacity Assessment as to Plaintiff. Dr. Wong indicated that Plaintiff was capable of lifting twenty pounds occasionally, ten pounds frequently, and could stand or walk about six hours in an eight-hour workday. Dr. Wong believed Plaintiff's pain to be mild and noted that only Motrin was used for pain. Plaintiff could occasionally climb, balance, kneel, crouch and crawl, and could frequently stoop. No limitations were assigned to manipulation, vision, communication, or environment. Dr. Wong believed Plaintiff was only partially credible regarding the severity of his pain. AR 115-122.

On March 30, 2006, Plaintiff saw Dr. Roberto Gugig at the CHCC Spina Bifida Clinic, primarily for complaints of constipation. It was recommended that his diet include more vegetables and proper fluids. In the event that dietary changes were unsuccessful, it was noted that prescription medications could be used to treat the constipation. AR 125-126.

That same date, Plaintiff was seen by Kevan Craig, D.O. Plaintiff complained of back pain since the 2002 surgery. He said the pain was very limiting, and caused him to be "kicked out of school" for excessive absenteeism. He indicated that he stays home and lies down, neither standing for too long or walking long distances. Dr. Craig's physical examination revealed good range of motion. However, when Dr. Craig asked Plaintiff to walk on his tiptoes, Plaintiff did not "put in an effort," and refused to stand on one leg because it would cause pain. Decreased range of motion in the back was attributed to the fusion. Dr. Craig thought Plaintiff looked depressed, but when asked Plaintiff indicated that he did not think he was depressed. The doctor's plan for Plaintiff's back pain included appropriate exercise because surgical repair was not necessary, and physical therapy at Community Sports Center. With regard to depression, the

doctor indicated he had a long discussion with Plaintiff on this issue. The family indicated they were in the process of getting him into "some sort of counseling," and the doctor strongly concurred because he believed depression was an issue. AR 127-129.

On April 8, 2006, Plaintiff was seen by Devonna Kaji, M.D., a urologist, for a neurogenic bladder. Plaintiff's mother indicated that he voided about every hour, and the frequency began after the 2002 surgery. He will get up three to four times during the night to void, but has been free of urine infections. Dr. Kaji noted Plaintiff experienced difficulty with sexual orientation and social problems, and discussed the need for renal ultrasound, VCUG and urodynamics with Plaintiff and his mother. The testing was scheduled. AR 130.

On October 26, 2006, Plaintiff was seen at CHCC by Dr. Kaji for a follow up regarding his neurogenic bladder. Plaintiff still complained of urgency with occasional suprapubic pain, but no incontinence. The notes indicate that there were "ongoing problems with noncompliance" in care and that further studies were necessary, in the form of the ultrasound, VCUG and urodynamics that were not previously completed as scheduled or requested. The risk of renal damage was discussed with Plaintiff and his mother, and it was noted that the needed testing was to be rescheduled. AR 109.

That same date, Plaintiff was seen by Michael Elliott, a pediatric orthopaedist, for an evaluation. Plaintiff complained the back pain had been persistent for some time, and worsened with any type of activity. Notations include "No neurologic problems. No psychiatric disorders." Dr. Elliott's impression was that Plaintiff "has an L5 myelomeningocele and is doing quite well with a leg length discrepancy and mild cavovarus foot and back pain." Dr. Elliott's suggestion was to fit Plaintiff with supramalleolar orthotics to improve leg length discrepancy and determine if back pain would be alleviated. The doctor also recommended physical therapy. AR 112-113.

Plaintiff also was seen in the CHCC Spina Bifida Clinic for a nutritional evaluation on October 26, 2006. A number of recommendations were made regarding Plaintiff's dietary habits and the need for healthier diet. AR 124.

1 On November 8, 2006, Dr. Woodward saw Plaintiff at CHCC for complaints of back pain since 2003. Plaintiff's range of motion was good and he was in no acute distress. Dr. Woodward noted that the "[f]amily has been completely noncompliant with suggestions for pain management and physical therapy." She opined that nothing could "be done to magically improve his moderate back pain condition." The doctor had no recommendations and did not believe Plaintiff needed a neurological follow up. AR 110-111.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of degenerative spondylolisthesis, severe myelodysplasia, status post multiple surgeries, status post L5-S1 fusion, split spinal cord surgery, and re-tethering of the spinal cord, left foot weakness, L5 myelomeningocele, and a history of spina bifida. Nonetheless, the ALJ determined these severe impairments did not meet or equal any listing impairments so as to result in a disability finding. AR 14.

Based on her review of the medical evidence, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work except for occasional climbing, balancing, kneeling, crouching, crawling and stooping. AR 14.

The ALJ, considering vocational factors such as age, education and past work experience, found that Plaintiff could perform sedentary jobs that exist in significant numbers in the national economy. AR 20-21.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and

the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[5] Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity; (2) has an impairment or a combination of impairments that is considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) has no past work history, yet has the RFC to perform sedentary work with

---

[5] All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

11

occasional postural limitations; and (5) considering age, education and RFC, there are a significant number of jobs in the national economy. AR 14-21.

# **DISCUSSION**

Plaintiff complains that the ALJ improperly failed to consider his mental impairment, and more particularly, that the ALJ failed to properly develop the record regarding the mental impairment.

A. <u>Plaintiff's Mental Impairment</u>

    1. *The ALJ Did Not Find Depression Or Gender Identity Disorder To Be Severe Mental Impairments*

Plaintiff contends that the ALJ "rejected the presence of any severe mental impairment" at step two, and thus committed reversible error by failing to properly develop "the presence of a mental impairment." Defendant contends that the ALJ properly determined Plaintiff did not suffer from a severe mental impairment "despite the diagnosis of depression."

The listings of impairments describe impairments "that are considered severe enough to prevent an adult from doing any gainful activity." 20 C.F.R. § 416.925(a). Most of these impairments are permanent or expected to result in death. *Id.* For all other impairments, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months. *Id.* If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry. 20 C.F.R. § 416.920(d).

To demonstrate that an impairment matches a listed impairment, the claimant must show that the impairment meets all of the medical criteria in a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. §§ 404.1526(a), 416.926(a). Under the law of this circuit, "[i]t is unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to satisfy every

different section of the listing of impairments." *Gonzales v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir.1990).

The ALJ found, in part, as follows:

> He alleges depressive symptoms, suicidal thoughts, paranoia, impaired concentration, and a desire to isolate himself, but he is not under the care of a psychologist or psychiatrist, and does not take any psychotropic medication therefor. Nor is he undergoing any counseling or psychotherapy. There is no prior psychiatric history. The claimant was seen at PACT in August, 2005, due to suicidal ideation, but admitted to using drugs and being stressed out over gender identity. He testified he was supposed to see a counselor, but did "not follow through." He also testified he is depressed for 30 minutes, and then "snaps out of it."

AR 19-20.

An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is properly made at step two when medical evidence establishes that a claimant has only a slight abnormality which would have no more than a minimal effect on his or her physical or mental ability to perform basic work activities. SSR 85-28. Here, the medical evidence clearly establishes that Plaintiff's depression and gender identity disorders had no more than a minimal effect of his physical or mental ability to perform basic work activities. The medical records reflect that Plaintiff was only treated specifically for depression and gender identity issues in August 2005, and the last significant reference to either condition occurred in March 2006. The physician's notes reference that Plaintiff's mother advised the doctor that they were going to get Plaintiff into counseling. AR 127-129. However, Plaintiff has never attended counseling. Plaintiff failed to follow through with recommendations that he seek counseling, and failed to seek any medical treatment whatsoever for either condition. Plaintiff takes no medication except for over-the-counter strength Tylenol to treat his back pain. There is nothing in the record to indicate that any depression or gender identity disorder suffered by Plaintiff has more than a minimal effect on his ability to perform basic sedentary work.

Although the absence of references to a claimant's condition are not as important as medical and lay testimony (*Smith v. Bowen*, 849 F.2d 1222, 1226 (9th Cir.1988)), the ALJ was entitled to draw an inference from the general lack of medical care for depression and gender identity disorder following the August 2005 incident and the numerous physicians who

recommended counseling thereafter. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (finding it appropriate to consider "an unexplained, or inadequately explained, failure to seek treatment"); *see also Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ is entitled to draw inferences logically flowing from the evidence). The records here establish that Plaintiff did not seek any medical care for nearly one year prior to the hearing. Moreover, Plaintiff last discussed depression or gender identity issues in April 2006, some seventeen months prior to the hearing.

It is Plaintiff's duty to prove that he is disabled. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require"); 20 C.F.R. §§ 404.1512(a) & (c) ("You must provide medical evidence showing that you have impairment(s) and how severe it is during the time you say you are disabled"). The mere diagnosis of an impairment is not sufficient to sustain a finding of disability. *Matthews v.* Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of disability); *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

    2. *The ALJ's Duty To Develop The Record Was Not Triggered Here As The Evidence Was Not Ambiguous Nor Was Additional Information Necessary*

Plaintiff argues that the ALJ had a duty to develop the record where Plaintiff claims to suffer from depression and a gender identity disorder. Plaintiff complains that by the time his case "proceeded to the hearing level, the administration had already abdicated its responsibility to property develop" Plaintiff's claim, and that the ALJ "failed to rectify this error and fairly and fully develop the record by not calling on the services of a medical expert or ordering a consultative examination." Defendant argues that the ALJ's duty was not triggered in this case because there was no ambiguity regarding Plaintiff's illness.

In general it is the duty of the claimant to prove to the ALJ that he is disabled. 20 C.F.R. § 404.1512(a). To this end, he must bring to the ALJ's attention everything that supports a disability determination, including medical or other evidence relating to the alleged impairment and its effect on his ability to work. *Id.* For his or her part, the ALJ has the responsibility to

develop "a complete medical history" and to "make every reasonable effort to help [the plaintiff] get medical reports." 20 C.F.R. § 404.1512(d). If this information fails to provide a sufficient basis for making a disability determination, or the evidence conflicts to the extent that the ALJ cannot reach a conclusion, he or she may seek additional evidence from other sources. 20 C.F.R. §§ 404.1512(e); 404.1527(c)(3); *see also Mayes v. Massanari*, 262 F.3d 963, 968 (9th Cir.2001).

It is Plaintiff's burden to produce full and complete medical records, not the Commissioner's. *Meanel v. Apfel,* 172 F.3d 1111, 1113 (9th Cir. 1999). However, when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence, the ALJ has a duty to develop the record. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). The ALJ may discharge this duty in one of several ways, including subpoenaing claimant's doctors, submitting questions to claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record. *Id.*

In *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996), the Ninth Circuit held that if the ALJ needs to know the basis of the doctor's opinion, he has a duty to conduct an appropriate inquiry. Here however, the ALJ had no such need. The record was neither ambiguous nor inadequate to allow for proper evaluation. Plaintiff was admitted to the PACT unit after he smoked crystal methamphetamine and threatened to hurt himself. He was observed overnight and released without treatment, although it was recommended that he seek counseling. Plaintiff failed to follow through. The issue of depression was noted several months later when Plaintiff was seen by doctors at CHCC, and counseling was again recommended. Again, Plaintiff failed to follow through. More than seventeen months had passed without a reference to depression or gender identity problems by the time the ALJ conducted the hearing. Nothing in the medical records here triggered the ALJ's duty to further develop the record. The existing evidence provided the ALJ with a sufficient basis for making a determination. *Mayes v. Massanari*, 262 F3d at 968.

It is important to note also that the "Commissioner 'has broad latitude in ordering a consultative examination.'" *Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001). Such an examination is necessary when "'additional evidence needed is not contained in the records' . . .

15

and those involving an 'ambiguity or insufficiency in the evidence [that] must be resolved.'" *Id*. As indicated previously, no additional evidence was needed here, nor was there any ambiguity or insufficiency in the available evidence.

The medical record here does not establish that depression or gender identity disorder were "severe enough to prevent an adult from doing any gainful activity." Nor did the evidence establish that either depression or gender identity disorder were impairments that had lasted or was expected to last for a continuous period of at least twelve months. More than twelve continuous months had passed between the last significant reference in Plaintiff's medical records to either depression or gender identity and the hearing before the ALJ.

The ALJ conducted a thorough review of the entire record and thereafter made a disability determination which is supported by substantial evidence. The Court finds that the record contained sufficient medical evidence for the ALJ to make an informed decision as to Plaintiff's alleged mental impairment, and that the ALJ did not err by failing to supplement the record with a consultative examination.

**CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Gabriel Soriano.

IT IS SO ORDERED.

Dated: **May 7, 2009**  /s/ **Gary S. Austin**
UNITED STATES MAGISTRATE JUDGE